UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

TARA M. WILSON,[1]                  :

                Plaintiff,          :
                                         09 Civ. 2632 (ALC)(HBP)
     -against-                      :
                                         REPORT AND
NEW YORK CITY POLICE DEPARTMENT,    :    RECOMMENDATION
et al.,
                                    :

                Defendants.         :

----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE ANDREW L. CARTER, United States

District Judge,


I.  Introduction


          Plaintiff brings this action pro se against her former

employer, the New York City Police Department ("NYPD"), former

co-workers and the City of New York, alleging (1) employment

discrimination on the basis of her race and gender, (2)

retaliation for engaging in a protected activity and (3) hostile

work environment/constructive discharge, all in violation of

_____

          [1] Although plaintiff initially filed her Complaint (Docket
Item 2) under her married name, Yearwood, her Amended Complaint
(Docket Item 4) and Affirmation in Opposition to the Motion to
Dismiss (Docket Item 39) were filed under her maiden name,
Wilson.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 et seq., and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code §§ 8-101 et seq. (Complaint for Employment Discrimination, dated Aug. 20, 2009 (Docket Item 4)("Am. Compl.")).

        Defendants move for summary judgment dismissing plaintiff's remaining claims (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."), dated March 23, 2012 (Docket Item 54)).  For the reasons set forth below, I respectfully recommend that defendants' motion be granted in its entirety.

II.  Facts

          A.    Procedural
                History

        On January 23, 2008, plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination and retaliation (Charge of Discrimination ("EEOC Charge"), annexed as Exhibit F to Declaration of Adam E. Collyer in Support of Defendants' Motion for Summary Judgment (Docket Item 55)("Collyer Decl.")).  On December 5, 2008, the United States Department of Justice issued a right-to-sue letter to

plaintiff (Letter from United States Department of Justice, annexed to Am. Compl.).  Plaintiff commenced this action on March 23, 2009 (Docket Item 2), and on August 20, 2009, filed an amended complaint ("Amended Complaint") alleging employment discrimination on the basis of race, gender and national origin, retaliation, hostile work environment, and constructive discharge, all in violation of Title VII, NYSHRL, and NYCHRL (Am. Compl. at 1-3).

     On May 18, 2010, defendants moved to dismiss the Amended Complaint on various grounds, including untimeliness, failure to exhaust administrative remedies, failure to state a claim, and failure to obtain jurisdiction over several unserved defendants (Docket Items 37-38).  On February 4, 2011, I issued a Report and Recommendation ("February 4 R&R") recommending that defendants' motion be granted in part and denied it in part. Wilson v. New York City Police Dep't, 09 Civ. 2632 (PAC)(HBP), 2011 WL 1215031 (S.D.N.Y. Feb. 4, 2011).  In particular, I recommended that the claims against several individual defendants be dismissed for lack of service, that the Title VII claims against all remaining individual defendants be dismissed, that plaintiff's claims of national origin discrimination be dismissed, and that plaintiff's NYSHRL and NYCHRL be dismissed to the extent they relied on discrete acts of alleged discrimination

before April 19, 2005.  <u>Wilson v. New York City Police Dep't</u>,

<u>supra</u>, 2011 WL 1215031 at *14.  With respect to the timeliness of

plaintiff's remaining Title VII claims, I noted that

>             the only claims that could possibly be timely are (1) a
>             hostile environment claim that included [plaintiff's
>             August 2007] transfer or the retirement and other
>             alleged conduct; (2) a discrimination claim based on
>             the transfer; (3) a retaliation claim based on the
>             transfer, and (4) a claim for constructive discharge.
>             Alleged events prior to March 29, 2007, are relevant
>             only to the extent they support a hostile environment
>             claim or constructive discharge claim or are evidence
>             of intent.  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, [536
>             U.S. 101, 113 (2002)].

<u>Wilson v. New York City Police Dep't</u>, <u>supra</u>, 2011 WL 1215031 at

*8.  Because defendants challenged plaintiff's remaining claims

in a wholly perfunctory manner, I denied their motion to dismiss.

<u>Wilson v. New York City Police Dep't</u>, <u>supra</u>, 2011 WL 1215031 at

*11-*13.  My February 4 R&R was adopted in full on March 25, 2011

by the Honorable Paul A. Crotty, United States District Judge, to

whom this matter was then assigned.  <u>Wilson v. New York City</u>

<u>Police </u>Dep't, 09 Civ. 2632 (PAC)(HBP), 2011 WL 1215735 (S.D.N.Y.

Mar. 25, 2011).

On July 18, 2012, defendants filed the present motion

for summary judgment, arguing that plaintiff's remaining claims

are time-barred, that she cannot establish that her 2007 transfer

and subsequent retirement were discriminatory or retaliatory, and

that she was not subjected to a hostile work environment or

constructively discharged from the NYPD (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."), dated March 23, 2012 (Docket Item 54)).

On October 1, 2012, after plaintiff failed to file any opposition to defendants' motion for summary judgment, I issued an Order informing plaintiff of the potential consequences of her failure to respond:

> By notice of motion filed on March 23, 2012 (Docket Item 53), the remaining defendants have moved for summary judgment dismissing the complaint.  To date, it appears that plaintiff has not served or filed any opposition to this motion, nor has she requested an extension of time within which to serve opposition papers.
>
> Although I shall consider the merits of defendants' motion and shall not grant the motion on default, a plaintiff's failure to submit any opposition to a motion for summary judgment makes it substantially more likely that the motion will be granted.  Thus, plaintiff's failure to oppose the motion increases the likelihood that the complaint will be dismissed.
>
> Accordingly, if plaintiff wishes to submit any opposition to defendants' pending motion, she is directed to submit such papers no later than November 14, 2012.  In the absence of a request for an extension of time, I shall consider the motion fully submitted as of that date and ready for decision.

(Docket Item 58).  Plaintiff did not respond to my October 1, 2012 Order in any way.  Consequently, I now consider the motion to be fully submitted.

B.   Background

1.   Plaintiff's Allegations[2]

The allegations underlying plaintiff's claims are set forth in detail in my February 4 R&R, familiarity with which is assumed, and require only brief review.  In sum, plaintiff's surviving claims allege that while employed by the NYPD from August 1998 until her retirement in September 2007, she was subjected to constant discrimination and harassment on account of her race and gender, culminating in a transfer from the Crime Analysis Unit to the Evidence Collection Team (see generally Typed Statement, annexed to Am. Compl., at 1-22).

Because plaintiff's Amended Complaint lacks a coherent narrative, my February 4 R&R attempted to set forth a non-exhaustive list of plaintiff's most serious allegations, the majority of which occurred well before March 29, 2007:

> (1)  "Lt. Michael Green[e] . . . sexually harassed [plaintiff] while assigned to the Police Academy . . . . constantly asked [plaintiff] for sex and forcefully kissed [plaintiff] promising to help

---

[2] Plaintiff's Amended Complaint consists of the Court's form employment discrimination complaint, the right-to-sue letter issued by the EEOC and a 22-page typed statement in which she sets forth numerous episodes of alleged mistreatment.  As noted in my February 4 R&R, plaintiff's Amended Complaint is rife with immaterial allegations, which shall not be discussed.

[plaintiff] get to where [she] wanted to go . . .
. Lt. Green[e]'s harassment continued throughout
[plaintiff's employment] in the NYPD. . . .
[Plaintiff] refused to exchange sex for any
position" (Typed Statement at 1);[3]

(2)   On October 15, 2005, Sgt. Craig Foster-Screen
asked plaintiff about "swinging" (which I
understand to mean extra-marital affairs) and
discussed his own history of swinging.  Plaintiff
found the conversation "extremely invasive and
inappropriate" (Typed Statement at 11-12);

(3)   In February 2006, Sgt. Mark Simmons requested that
plaintiff type for him "as if he thought
[plaintiff] was inferior because [she] was a
woman";

> He also made [plaintiff] feel uncomfortable
> in that he made reference to a previous
> relationship that [plaintiff] had with a male
> White that left the job and became a
> firefighter.  [Plaintiff] was annoyed that he
> had the nerve to ask [her] about it because
> it was something that [plaintiff] never
> acknowledged because it was a personal
> matter.  He stated that he could never sleep
> with a woman that slept with a White man and
> [plaintiff] let him know that he should only
> be thinking about sleeping with his wife.  He
> was always concerned with [plaintiff's]
> appearance. . . .  While trying to do [her]
> work it was made clear that he was
> distracting [plaintiff] from doing [her] job
> . . . .  He was overwhelming and spoke of his
> relationship with a bisexual sergeant . . . .

(Typed Statement at 12-13);

---

[3] Plaintiff's allegations concerning Greene are discussed
under the heading "December 2004," with no further information
concerning when the harassment began or ended.

(4)  In March 2006, Lt. Scott Henderson "was biased"
because he "stopped speaking" with plaintiff after
she began seeing a white officer on a social
basis.  Henderson had previously been cordial with
plaintiff.  Henderson failed to return plaintiff's
calls in a timely manner although he returned
calls to Detectives Grier, Johnson and Williams
promptly.  This frustrated plaintiff's ability to
get work done.  Plaintiff states she "began to
correlate" Henderson's actions with her having had
a previous relationship with a white man (Typed
Statement at 13);

(5)  In September 2006, "a known bisexual white female
Sergeant Margaret Ross touch[ed] [plaintiff's]
hand in a sexual manner, sort of in a caressing
way."  Plaintiff, who was upset, reported this
incident to Deputy Chief James Secreto.  Plaintiff
claims that another sergeant told plaintiff that
Ross liked "Black" women.  Without any specifics,
plaintiff claims that she was "sexually harassed"
everywhere she went.  Plaintiff disagreed with
Ross's method of training her, and plaintiff
believed that Ross had a problem with plaintiff
being "a Black young sergeant."  Plaintiff alleges
that "they allowed [Ross] to have privileges that
[plaintiff] didn't" (Typed Statement at 18-19);

(6)  In or about October or November 2006, plaintiff
alleges that Det. Carl McLaughlin ran up to her
and kissed her on the cheek.  Plaintiff reported
the matter to the Internal Affairs Bureau.  She
also reported unspecified "racial comments" made
by Compstat unit officers to their supervisor.
Plaintiff further alleges that during October and
November 2006, she requested assistance from Ross
but received none, that Ross and other white
sergeants received overtime while plaintiff did
not and that a white sergeant was given a post in
the Communications unit that plaintiff had been
promised (Typed Statement at 20);

(7)  On January 29, 2007, plaintiff found a picture
depicting unspecified "offensive material" in the
cubicle of one of her subordinates, and she

reported it to OEEO; plaintiff provides no information concerning the nature of the picture. Plaintiff claims she was subsequently subjected to "harassment" by Inspector Thursland and DI Lavelle because of her reports concerning the picture.  On April 4, 2007, plaintiff returned to PBBS after being out sick and was reassigned to the Evidence Collection Unit (Typed Statement at 21). Plaintiff

> believed [her] supervisors were retaliating against [her] because [she] was transferred and [her] tour of duty was changed. . . . When transferred [plaintiff] was told that [she] could have a flexible tour and working a [4 p.m. to midnight shift] was a tour that [plaintiff] could not work because [she] had children.  When [plaintiff] began to question Lt. Miranda, she simply stated they needed a sergeant there and she was gay! [Plaintiff] then began to realize that they were trying to help [her] spouse take custody of [her] son.  [Plaintiff's] son has been assigned a retired housing police officer as his Law guardian who has shown bias towards [her] and favors [her] ex-husband.

(Typed Statement at 21).

Plaintiff concludes her Amended Complaint with the following summary:

> Discriminatory practices and a hostile work environment is why I was forced to ultimately receive a disability 1/3 pension after serving 9 years and being out psychologically sick.  I suffered an emotional breakdown and was assigned to the psychological services unit while a uniformed member of the New York City Police Department.  I was later diagnosed with having psychosis while assigned to PBBS and might have had this psychological impairment since assigned to OEEO.  I could not pin point the actual start of my breakdown but I know it is as a result of what transpired in the workplace.  The police department

9

> intentionally created a hostile work environment where
> gay women imposed on me in a sexual manner and
> ultimately ruined my marriage.

(Typed Statement at 21-22).

On May 10, 2010, plaintiff submitted an Affirmation in Opposition to defendants' motion to dismiss, in which she further alleged, <u>inter alia</u>, that "high ranking officers in the New York City Police Department intentionally sabotaged [her] career and covered up their discriminatory acts by using 'psychosis' and the psychological services unit" and that she "was raped and set up to have several fictitious friendships and relationships" (Affirmation in Opposition to Motion, dated May 10, 2010 (Docket Item 39) ("Pl's Aff."), at 1-2).  On November 29, 2011, at her deposition, plaintiff testified about various incidents of perceived discrimination and harassment, some dating back more than thirty years, involving doctors, teachers, hip-hop musicians, members of Greek organizations at her college, telecommunications workers, her other past employers, and various members of the NYPD (<u>see</u> <u>generally</u> Excerpts from Plaintiff's Deposition ("Pl's Dep."), annexed as Exhibit D to Collyer Decl.). As stated above, plaintiff has offered no opposition to defendants' present motion, nor has she offered any other evidence in support of her claims.

2.   Defendants' Statement
of Undisputed Facts

As part of their motion of summary judgment, and
pursuant to Local Civil Rule 56.1, defendants have submitted a
statement of undisputed facts which they contend have been
established either through documentary evidence or by a
declarations submitted in connection with their motion
(Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts,
dated Mar. 23, 2012 (Docket Item 56) ("Defs.' 56.1 St.")).   In
accordance with Local Civil Rule 56.2, defendants have also
provided plaintiff with notice of the requirements of
Fed.R.Civ.P. 56 (see Notice To Pro Se Litigant Who Opposes a
Motion For Summary Judgment Pursuant to Local Civil Rule 56.2,
annexed to Defs.' 56.1 St.).   Nevertheless, plaintiff has failed
to submit her own Local Rule 56.1 statement.   Accordingly, I deem
the facts set forth in Defs' 56.1 St. as admitted by plaintiff.
Pearson v. Lynch, 10 Civ. 5119 (RJS), 2012 WL 983546 at *1 n.1
(S.D.N.Y. Mar. 22, 2012) (Sullivan, D.J.), citing Local Civ. R.
56.1(c), and Gitlow v. United States, 319 F. Supp. 2d 478, 480
(S.D.N.Y. 2004) (Kaplan, D.J.).   However, defendants must still
show that they are entitled to judgment as a matter of law based
on evidence in the record.   Holtz v. Rockefeller & Co., 258 F.3d
62, 74 (2d Cir. 2001).   The facts that follow are undisputed.

11

Plaintiff is a woman of Panamanian descent[4] who worked in the NYPD from August 1998 until her retirement in September 2007 (see Defs.' 56.1 St. ¶¶ 5-11).  She was promoted to sergeant in November 2004 (Defs.' 56.1 St. ¶ 8).  In July 2005, she was transferred, upon request, to the Office of Equal Employment Opportunity ("OEEO"), and in September 2006, she was transferred to Patrol Bureau Brooklyn South ("PBBS"), where she worked in the Crimes Analysis Unit (Defs.' 56.1 St. ¶¶ 9-11).

In February 2007, plaintiff complained to the NYPD's Internal Affairs Bureau ("IAB") that crimes were being misclassified by her coworkers (Defs.' 56.1 St. ¶ 12).  On February 27, 2007, Plaintiff was interviewed by Captain DiBlasio, a member of PBBS's Investigations Unit, about her misclassification allegations (Defs.' 56.1 St. ¶ 13).  During the interview, plaintiff made inconsistent statements, stated that she wanted to resign, and told Captain DiBlasio to "take [her] gun and shield" (Defs.' 56.1 St. ¶ 14).  Plaintiff was relieved of her firearms and she was referred to the NYPD's Psychological Evaluation Section ("PES") (Defs.' 56.1 St. ¶ 15-16).  At the

---

[4] In her Amended Complaint, plaintiff identifies herself as "black" (Am. Compl. at 3).  However, at her deposition, plaintiff states that she is "Hispanic," that she is "not an African-American," and that she "didn't mean to" identify herself as black in the Amended Complaint (Pl's Dep. 13, 60).

PES, plaintiff told the examiner that she wanted time off due to distress from marital difficulties, and that her husband had left her seven months earlier (Defs.' 56.1 St. ¶ 17).  Plaintiff was not placed on restricted duty, but was given permission to take unscheduled leave (Defs.' 56.1 St. ¶ 18).

On April 4, 2007, plaintiff was scheduled to return to work (Defs.' 56.1 St. ¶ 19).  Plaintiff's co-worker stated that while she was driving with plaintiff to the police station, plaintiff was "talking irrationally," and that "plaintiff believed that people on the street were talking about her, that the songs on the radio were about her, and that she went to the Pension section to retire but instead took a personal loan" (Defs.' 56.1 St. ¶ 21).  On the same date, plaintiff was again referred to the PES, where she reported that was suffering from "'paranoid thoughts,' including the belief that her phone was tapped and that her estranged husband was having an affair with a former co-worker" (Defs.' 56.1 St. ¶ 24).  Plaintiff, who was crying throughout the interview, also reported sleeping poorly, losing weight, having "racing thoughts," and experiencing difficulty maintaining concentration and attention (Defs.' 56.1 St. ¶ 25).  She was placed on psychological restricted duty

13

(Defs.' 56.1 St. ¶ 29),[5] and her weapons and ID card were permanently taken from her (Defs.' 56.1 St. ¶ 33).[6]  Plaintiff was referred to Dr. Livia Beck, a psychologist, who prescribed Seroquel for plaintiff (Defs.' 56.1 St. ¶ 26).  Plaintiff did not take the Seroquel because she had been previously been prescribed another medication, Effexor, that made her feel "drained" (Defs.' 56.1 St. ¶ 27).  During this same time period, plaintiff also began to attend psychotherapy sessions with clinical social worker Robin Cannariato (Defs.' 56.1 St. ¶ 28).

On May 2, 2007, the police were summoned to defuse a verbal dispute between plaintiff and her ex-boyfriend about their fifteen-year-old daughter (Defs.' 56.1 St. ¶ 34-35).  On June 11, 2007, the police responded to another dispute between plaintiff and her boyfriend over their daughter's custody (Defs.' 56.1 St. ¶ 36).  An officer who interviewed plaintiff regarding these incidents reported that plaintiff "was often confused and non-responsive to requests for information" and that her "lack or

---

[5] According to NYPD policy, restricted duty is reserved for officers who are unable to perform full duty due to medical reasons (Defs.' 56.1 St. ¶ 30).  Although such officers are "generally assigned administrative tasks," plaintiff was allowed to stay out of work on paid sick leave (Defs.' 56.1 St. ¶ 31-32).

[6] The record is unclear as to whether plaintiff regained possession of her weapons and ID card in the period between their initial removal on February 27, 2007 and their permanent removal on April 4, 2007.

attention and loss of focus were noteworthy" (Defs.' 56.1 St. ¶ 39-41).  Plaintiff also chose to stop seeing social worker Cannariato although the record is not clear as to when this occurred (Defs.' 56.1 St. ¶¶ 39-41).

Although nothing in the record identifies a specific date, while plaintiff was on restricted duty, another officer was given plaintiff's assignment at PBBS, and plaintiff was transferred to the 60th Precinct to serve as an Evidence Collection Technician (Defs.' 56.1 St. ¶¶ 44-45).  Plaintiff was scheduled to return to work on August 7, 2007, but on August 6, she lodged a complaint with IAB alleging that the transfer from the Crime Analysis Unit to the Evidence Collection Team was an act of retaliation by Sgt. Margaret Ross for plaintiff's previous complaint about crime misclassification[7] (Defs.' 56.1 St. ¶¶ 43, 51).  On August 7, 2007, plaintiff submitted paperwork for vested-interest retirement[8] (Defs.' 56.1 St. ¶ 43).  Three days later, on August 10, she submitted an application for Psychiatric Disability Retirement (Defs.' 56.1 St. ¶ 48).  Plaintiff was

---

[7] After interviewing both plaintiff and Sgt. Ross, the IAB issued a report finding that plaintiff's allegations were unsubstantiated (Defs.' 56.1 St. ¶ 53-54).

[8] "Vested-interest retirement refers to retirement after five[]years of service, but prior to the 20-year service requirement [f]or disability retirement options" (Defs.' 56.1 St. ¶ 47).

placed on pre-separation leave after her vested-interest retirement was approved (Defs.' 56.1 St. ¶ 49).

On September 14, 2007, plaintiff was arrested for assault in the third degree after she "threw a plastic cup at her estranged husband, Sgt. Anwar Yearwood, scratched him and punched him, and pulled a gold chain from his neck" (Defs.' 56.1 St. ¶¶ 55-56). Because of her arrest, plaintiff was suspended from the NYPD (Defs.' 56.1 St. ¶ 57). The NYPD preferred charges against plaintiff on September 17, 2007 (Defs.' 56.1 St. ¶ 58).

On September 18, 2007, plaintiff filed a police report with the Nassau County Police Department ("NCPD") alleging that on June 21, 2006, her husband had urinated on her in the shower (Defs.' 56.1 St. ¶ 59). She told the investigating lieutenant at the NCPD that "voices were telling her to file [the] report and that she should argue with her husband" (Defs.' 56.1 St. ¶ 60). Plaintiff was taken to Franklin General Hospital for psychiatric evaluation, and she was diagnosed with Major Depressive Disorder and "[rule out] Schizophreniform Disorder" (Defs.' 56.1 St. ¶ 62; Psychological Evaluation of Sergeant Tara Yearwood, dated Nov. 16, 2007 ("Nov. 16 Eval."), annexed as Exhibit H to Collyer Decl., at 4).

Plaintiff retired from the NYPD on September 23, 2007, and her vested-interest retirement was soon amended to Ordinary Disability Retirement (Defs.' 56.1 St. ¶¶ 63-64).

On January 23, 2008, plaintiff filed an EEOC charge alleging discrimination and retaliation for engaging in a protected activity (Defs.' 56.1 St. ¶ 70).  Although plaintiff denied any auditory hallucinations when she met with PES in November 2007, she stated in her EEOC charge that during the same time period, she "began to hear 'voices' and all of the voices were of people that were familiar to [her]" (Defs.' 56.1 St. ¶ 72).  Between October 12, 2007 and April 7, 2008, plaintiff also filed eighteen separate complaints, fifteen of which were lodged with the IAB in February 2008, alleging various acts of misconduct by her estranged husband and her co-workers at the NYPD (Defs.' 56.1 St. ¶ 65-66).  When interviewed, plaintiff stated to the IAB that she had "been hearing voices in her head for the past year" and that the "voices told her to lodge the complaints against the named [officers]" (Defs.' 56.1 St. ¶ 67-68; Closing of O.G. Case #08-00079 and Recommendation, dated Apr. 7, 2008, annexed as Exhibit S to Collyer Decl., at 2-3).  All of plaintiff's allegations were marked closed on April 7, 2008 (Defs.' 56.1 St. ¶ 69).

17

III.  Analysis

  A.  Summary Judgement
      Standards

     The standards applicable to a motion for summary
judgment are well-settled and require only brief review.

          Summary judgment may be granted only where there
     is no genuine issue as to any material fact and the
     moving party . . . is entitled to a judgment as a
     matter of law.  Fed.R.Civ.P. 56(c).  In ruling on a
     motion for summary judgment, a court must resolve all
     ambiguities and draw all factual inferences in favor of
     the nonmoving party.  Anderson v. Liberty Lobby, Inc.,
     477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202
     (1986).  To grant the motion, the court must determine
     that there is no genuine issue of material fact to be
     tried.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23,
     106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A genuine
     factual issue derives from the "evidence [being] such
     that a reasonable jury could return a verdict for the
     nonmoving party."  Anderson, 477 U.S. at 248, 106 S.Ct.
     2505.  The nonmoving party cannot defeat summary
     judgment by "simply show[ing] that there is some
     metaphysical doubt as to the material facts,"
     Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
     U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986),
     or by a factual argument based on "conjecture or
     surmise," Bryant v. Maffucci, 923 F.2d 979, 982 (2d
     Cir. 1991).  The Supreme Court teaches that "all that
     is required [from a nonmoving party] is that sufficient
     evidence supporting the claimed factual dispute be
     shown to require a jury or judge to resolve the
     parties' differing versions of the truth at trial."
     First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S.
     253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); see
     also Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct.
     1545, 143 L.Ed.2d 731 (1999).  It is a settled rule
     that "[c]redibility assessments, choices between
     conflicting versions of the events, and the weighing of
     evidence are matters for the jury, not for the court on

18

a motion for summary judgment." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006); accord Hill v. Curcione, 657 F.3d 116, 124 (2d Cir. 2011); Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005); Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004).

"Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Coppola v. Bear Stearns & Co., Inc., 499 F.3d 144, 148 (2d Cir. 2007), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007).  "'[I]n ruling on a motion for summary judgment, a judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented[.]'" Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 788 (2d Cir. 2007), quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 298 (2d Cir. 1996).

The Court of Appeals for the Second Circuit has explained that "in determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial,

the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that the citation to evidence in the record supports the assertion." Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).

Summary judgment is "ordinarily inappropriate" in employment discrimination cases where the employer's intent and state of mind are in dispute. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000); Cifarelli v. Vill. of Babylon, 93 F.3d 47, 54 (2d Cir. 1996); see Gallo v. Prudential Residential Servs., Ltd. P'ship, supra, 22 F.3d at 1224; Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 103 (2d Cir. 1989); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Moreover, in discrimination cases

> summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial . . . . There must either be a lack of evidence in support of the plaintiff's position, . . . or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error.

Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998) (footnote and citations omitted). See Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) (Ramos, D.J.).

20

When deciding whether summary judgment should be granted in a discrimination case, we must take additional considerations into account. <u>Gallo v. Prudential Residential Services</u>, 22 F.3d 1219, 1224 (2d Cir. 1994). "A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." <u>Id</u>. "[A]ffidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." <u>Id</u>. Summary judgment remains appropriate in discrimination cases, as "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to . . . other areas of litigation." <u>Weinstock</u>, 224 F.3d at 41 (internal quotation marks omitted); <u>see also</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

<u>Desir v. City of New York</u>, 453 F. App'x 30, 33 (2d Cir. 2011).

Finally, even when a summary judgment motion is unopposed, the Court must examine the record to determine whether a genuine issue of fact exists for trial; a summary judgment motion cannot be granted on default. <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, <u>supra</u>, 373 F.3d at 244.

B.  Application of the
    <u>Foregoing Principles</u>

Plaintiff's surviving claims can be classified as follows: (1) discrimination based on race and gender in connection with her transfer, (2) retaliation, and (3) hostile work environment/constructive discharge based on discrimination

21

and harassment.  Each claim purportedly alleges a violation of
Title VII, NYSHRL and NYCHRL.

> 1.  Plaintiff's Claims of
>     <u>Discrimination</u>

Plaintiff's claims of race and gender discrimination in
violation of Title VII and NYSHRL are all properly analyzed under
the now familiar framework first set forth in <u>McDonnell Douglas
Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  <u>Simmons v. Akin Gump
Strauss Hauer & Feld, LLP</u>, 11-4480-CV, 2013 WL 261537 at *1 (2d
Cir. Jan. 24, 2013) (summary order).  Plaintiff's NYCHRL
discrimination claims are analyzed under a less stringent,
modified <u>McDonnell Douglas</u> framework, as discussed further below.
<u>See</u> <u>Simmons v. Akin Gump Strauss Hauer & Feld, LLP</u>, <u>supra</u>, 2013
WL 261537 at *1 ("[T]he [NYCHRL], amended by the Local Civil
Rights Restoration Act of 2005, was intended to provide a remedy
reaching beyond those provided by the counterpart federal civil
rights laws.").

"Following the Supreme Court's directive, plaintiff
must initially come forward with facts sufficient to establish a
<u>prima facie</u> case that [she suffered an adverse employment action]
under circumstances giving rise to an inference of
discrimination."  <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47,

52 (2d Cir. 1998).  "The burden of establishing a prima facie case is not a heavy one.  One might characterize it as minimal." Carlton v. Mystic Transp. Inc., supra, 202 F.3d at 134; see Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997) (per curiam); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (describing the burden of production as de minimis).

If a plaintiff succeeds in establishing a prima facie case of discrimination, a presumption is created "that the employer discriminated against the employee in an unlawful manner," Greenway v. Buffalo Hilton Hotel, supra, 143 F.3d at 52, and the burden then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for its actions.  Carlton v. Mystic Transp., Inc., supra, 202 F.3d at 134; Gallo v. Prudential Residential Servs. Ltd. P'ship, supra, 22 F.3d at 1224; Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999).

> The defendant's burden of production also is not a demanding one; [it] need only offer such an explanation for the employment decision.  Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with the plaintiff.

Bickerstaff v. Vassar Coll., supra, 196 F.3d at 446 (citations omitted).

If the employer articulates a non-discriminatory reason for the termination, the presumption of discrimination raised by

the prima facie case "simply drops out of the picture."  St.
Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11.  See Carlton v.
Mystic Transp., Inc., supra, 202 F.3d at 134-35.  At this point,
the burden shifts back to the plaintiff to offer proof that would
allow a rational fact finder to conclude that the employer's
proffered reason for the termination was pretextual.  St. Mary's
Honor Ctr. v. Hicks, supra, 509 U.S. at 507-08; Carlton v. Mystic
Transp., Inc., supra, 202 F.3d at 135.  Although the presumption
of discrimination "drops out of the picture" once the defendant
meets its burden of production, "the trier of fact may still
consider the evidence establishing the  plaintiff's prima facie
case and inferences properly drawn therefrom . . . on the issue
of whether the defendant's explanation is pretextual . . . ."
Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143
(2000) (internal quotation marks omitted).  "[A] plaintiff's
prima facie case, combined with sufficient evidence to find that
the employer's asserted justification is false, may permit the
trier of fact to conclude that the employer unlawfully
discriminated."  Reeves v. Sanderson Plumbing Prods., Inc.,
supra, 530 U.S. at 148.

        At the third step, New York state courts no longer
apply a straightforward McDonnell Douglas analysis when examining
NYCHRL claims on summary judgment (see Defs.' Mem. at 20-22).

24

Rather, New York state courts have held that "an action brought under NYCHRL must, on a motion for summary judgment, be analyzed both under the McDonnell Douglas framework and the somewhat different 'mixed-motive' framework recognized in certain federal cases." Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 113, 946 N.Y.S.2d 27, 30 (1st Dep't 2012).  The Appellate Division has described the mixed motive framework as follows:

> If a plaintiff can prevail on a "mixed motive" theory, it follows that he or she need not prove that the reason proffered by the employer for the challenged action was actually false or entirely irrelevant. Rather, under this analysis, the employer's production of evidence of a legitimate reason for the challenged action shifts to the plaintiff the lesser burden of raising an issue as to whether the action was "motivated at least in part by . . . discrimination (Estate of Hamilton v. City of New York, 627 F.3d 50, 56 [2d Cir. 2010] [internal quotation marks omitted] ) or, stated otherwise, was "more likely than not based in whole or in part on discrimination" (Aulicino v. New York City Dept. of Homeless Servs., 580 F.3d 73, 80 [2d Cir. 2009] [internal quotation marks omitted]).

Melman v. Montefiore Med. Ctr., supra, 98 A.D.3d at 127, 946 N.Y.S.2d at 41; see also Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 34-45, 936 N.Y.S.2d 112, 116-24 (2011).

In order to meet her burden with respect to a prima facie case of discrimination, plaintiff must offer evidence sufficient to give rise to an issue of fact as to four elements: (1) she is a member of a protected class (2) she was qualified for the position; (3) she was subject to an adverse employment

action and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class.  Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005); Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002); Brennan v. Metro. Opera Ass'n Inc., 192 F.3d 310, 316 (2d Cir. 1999); Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999); Hills v. City of New York, 03 Civ. 4265 (WHP), 2005 WL 591130 at *3 (S.D.N.Y. Mar. 15, 2005) (Pauley, D.J.); Beckmann v. Darden, 351 F. Supp. 2d 139, 146 (S.D.N.Y. 2004) (Robinson, D.J.); Williams v. Salvation Army, 108 F. Supp. 2d 303, 308 (S.D.N.Y. 2000) (Berman, D.J.), citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

For purposes of this motion I shall assume that plaintiff can establish that she is a member of a protected class and that she was qualified for the position she held at the NYPD. See Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001) ("To show 'qualification' . . . the plaintiff need not show perfect performance or even average performance.  Instead, [he] need only make the minimal showing that [he] possesses the basic skills necessary for performance of the job." (inner quotations and citations omitted; emphasis in original)).  With respect to the third element of plaintiff's prima facie case, an adverse

26

employment action, plaintiff discusses her transfer from the
Crime Analysis Unit to the PBBS Evidence Collection Team.  She
states in her Amended Complaint that:

> After being out sick, I returned to work on April 4,
> 2007 to Patrol Borough Brooklyn South.  I was re-
> assigned to the Evidence Collection Unit and told I had
> to work a 4x12 tour of duty.  I was stressed about my
> children and again believed my supervisors were
> retaliating against me because I was transferred and my
> tour of duty was changed.  I did not understand why I
> was transferred from the CompStat Unit without an
> explanation and working another tour. . . . When
> transferred I was told that I could have a flexible
> tour and working a 4x12 was a tour that I could not
> work because I had children.  When I began to question
> Lt. Miranda, she simply stated that they needed a
> sergeant there and she was gay!  I then began to
> realize that they were trying to help my spouse take
> custody of my son.

(Typed Statement at 21).  Despite defendants' arguments to the
contrary, "[t]he Second Circuit . . . has not ruled out the
possibility that a shift change could rise to the level of an
adverse employment action," and "'a transfer that affects a
parent's ability to spend time with and care for a child' could,
on a case by case basis, support a Title VII retaliation claim."
Forsythe v. New York City Dep't of Citywide Admin. Services, 733
F. Supp. 2d 392, 400 (S.D.N.Y. 2010) (Maas, M.J.), aff'd, 428 F.
App'x 40 (2d Cir. 2011), quoting Cruz v. Liberatore, 582 F. Supp.
2d 508, 524 (S.D.N.Y. 2008) (Robinson, D.J.); see also Albuja v.
Nat'l Broad. Co. Universal, Inc., 851 F. Supp. 2d 599, 607-08

27

(S.D.N.Y. 2012)(Marrero, D.J.).[9]   Given the nature of
plaintiff's allegations, the foregoing authorities and the lack
Second Circuit authority on this issue, I cannot say that
plaintiff's shift change was not an adverse employment action as
a matter of law.

Although plaintiff is able to establish the first three
elements of her prima facie case, she is unable to do so with
respect to the fourth element; she offers no evidence suggesting
that she was transferred under circumstances that give rise to an
inference of discrimination.  In her EEOC charge, plaintiff
states the following:

> Having made several allegations to both the Office of
> Equal Employment Opportunity regarding the display of
> offensive material and to the Internal Affairs Bureau
> about crime reporting statistics, I was transferred.  I
> believe this transfer could have been attributed to the
> fact that I was the only minority supervisor assigned
> to that unit.  The only explanation that I was given
> was that the position was created for me when I was
> assigned to the unit and when I returned from being on
> sick report, they decided that someone else had filled
> the position.

(EEOC Charge at 2).  However, when asked at her deposition to
identify the specific discriminatory acts committed by

---

[9] Plaintiff also seems to argue that her departure from the
NYPD constitutes an adverse employment action.  However, the
evidence makes clear that plaintiff voluntarily retired and even
received a pension, belying such an assertion (Defs.' 56.1 St. ¶¶
46-48, 63-64).

defendants, plaintiff failed to even mention her transfer (<u>see generally</u> Pl's Dep.).  Plaintiff has come forward with no evidence that her race or gender played any role in the decision to transfer her.  Thus, plaintiff's belief that her transfer "could have been attributed to the fact that [she] was the only minority supervisor assigned to that unit," appears to be nothing more than the type of speculation that is unable to withstand a motion for summary judgment.  See <u>Niagara Mohawk Power Corp. v. Jones Chem., Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003) ("To survive summary judgment the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. . . . Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." (inner quotations, citations and emphasis omitted)).

        Finally, even if I make the unwarranted assumption that plaintiff has satisfied her burden with respect to a <u>prima</u> <u>facie</u> case of discrimination and analyze the case at the third step of the <u>McDonnell</u> <u>Douglas</u> analysis, plaintiff has offered no evidence to rebut the non-discriminatory reason offered by defendants for the transfer, <u>i</u>.<u>e</u>., the fact that plaintiff was on psychological and sick leave between February 27, 2007 and August 7, 2007, and that "PBBS needed someone to perform plaintiff's job responsibilities" (Defs.' Mem. at 7).  It is perfectly reasonable

that, given plaintiff's protracted absence, the NYPD would have needed someone else to perform the duties to which plaintiff had been assigned, and plaintiff offers no evidence that discriminatory animus played a role in defendants' decision not to reassign plaintiff to the PBBS.  Even under the more lenient standard applicable to plaintiff's NYCHRL discrimination claim, the result is no different.  Therefore, given the failure of plaintiff to come forward with any evidence of race- or gender-based animus on the part of defendant, I conclude that there is no genuine issue of fact concerning the reasons for plaintiff's transfer and the termination of her employment, that race and gender played no role in those decisions and that summary judgment dismissing these claims is, therefore, appropriate.

### 2.  Plaintiff's Claims of Retaliation

Plaintiff also alleges that she was the victim of retaliation in violation of Title VII, NYSHRL and NYCHRL.

Retaliation claims under NYSHRL are analyzed under the same framework that is applicable to retaliation claims brought under Title VII.  Vito v. Bausch & Lomb Inc., 403 F. App'x 593, 597 (2d Cir. 2010); Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010); Bennett v. Verizon Wireless,

326 F. App'x 9, 10 (2d Cir. 2009).  As explained below, the reach

of the anti-retaliation provision of NYCHRL is somewhat broader.

Fincher v. Depository Trust & Clearing Corp., supra, 604 F.3d at

723.

　　　　To establish a prima facie case of retaliation under

either Title VII or NYSHRL, a  plaintiff must demonstrate that:

(1) she engaged in protected activity; (2) the employer was aware

of this activity; (3) the employer took adverse action against

her and (4) a causal connection exists between the protected

activity and the adverse action, i.e., that a retaliatory motive

played a part in the adverse employment action.  Sista v. CDC

Ixis N. Am., Inc., 445 F.3d 161, 177 (2d Cir. 2006); Constance v.

Pepsi Bottling Co. of N.Y., 03-CV-5009 (CBA)(MDG), 2007 WL

2460688 at *34 (E.D.N.Y. Aug. 24, 2007).  Under NYCHRL,

> retaliation "in any manner" is prohibited, and "[t]he
> retaliation . . . need not result in an ultimate action
> with respect to employment . . . or in a materially
> adverse change in the terms and conditions of
> employment."  N.Y.C. Admin. Code § 8-107(7); see also
> Williams, 61 A.D.3d at 69-72, 872 N.Y.S.2d at 33-35;
> Sorrenti v. City of New York, 17 Misc. 3d 1102(A), 851
> N.Y.S.2d 61 (Table) (N.Y. Sup. 2007) (unreported
> decision) ("[T]he City Council enacted a less
> restrictive standard [than the federal and state
> standard] to trigger a [CHRL] violation in that it is
> now illegal to retaliate in any manner."); Pilgrim v.
> McGraw-Hill Cos., Inc., 599 F. Supp. 2d 462, 469
> (S.D.N.Y. 2009) ("The prima facie standard for
> retaliation claims under the CHRL is different [from
> the federal and state standard], in that there is no
> requirement that the employee suffer a materially

adverse action.  Instead, the CHRL makes clear that it
is illegal for an employer to retaliate in 'any
manner.'").

Fincher v. Depository Trust & Clearing Corp., supra, 604 F.3d at
723.

A plaintiff may establish the requisite causal
connection between the protected activity and the retaliatory
conduct "(1) indirectly, by showing that the protected activity
was followed closely by discriminatory treatment, or . . . (2)
directly, through evidence of retaliatory animus directed against
the plaintiff by the defendant."  Gordon v. N.Y.C. Bd. of Educ.,
232 F.3d 111, 117 (2d Cir. 2000); White v. Whitman, 99 Civ. 4777
(FM), 2002 WL 776589 at *10 (S.D.N.Y. Apr. 26, 2002) (Maas,
M.J.).  Where a plaintiff relies on temporal proximity as
circumstantial evidence of causation, the "temporal proximity
must be 'very close.'"  Little v. Nat'l Broad. Co., 210 F. Supp.
2d 330, 385 (S.D.N.Y. 2002) (Scheindlin, D.J.), quoting Clark
Cnty. Sch. Dist. v. Breeden, supra, 532 U.S. at 273; accord
Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010)
("Close temporal proximity between the plaintiff's protected
action and the . . . adverse action may in itself by sufficient
to establish the requisite causal connection.").  However, the
Second Circuit has "not drawn a bright line to define the outer
limits beyond which a temporal relationship is too attenuated to

establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009), quoting Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001).

Once plaintiff demonstrates a prima facie case, the burden shifts to defendant to articulate legitimate, non-retaliatory reasons for its actions.  Once the defendant does so, the burden shifts back to plaintiff to show that the articulated reasons are pretextual.  Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 92 (2d Cir. 2011).  Although temporal proximity can be sufficient to support an inference of causation at the prima facie stage, it is insufficient to show pretext at the third step.  El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. . . . Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact."), citing Quinn v. Green Tree Credit Corp., 159 F.3d

759, 770 (2d Cir. 1998); Dixon v. Int'l Fed'n of Accountants, 416
F. App'x 107, 110-11 (2d Cir. 2011).

In my February 4 R&R, I determined that plaintiff's
only timely retaliation claims could be those relating to her
2007 transfer.  Wilson v. New York City Police Dep't, supra, 2011
WL 1215031 at *8.  I shall assume without deciding that plaintiff
engaged in protected activity by filing complaints of
discrimination with the OEEO and the IAB, and that her subsequent
transfer constituted an adverse employment action.

With respect to the third element, causality, the
Second Circuit "has not identified an outer limit beyond which a
temporal relationship is too attenuated to support a finding of
causality" and instead "exercise[s], [its] judgment about the
permissible inferences that can be drawn from temporal proximity
in the context of particular cases," Kim v. Columbia Univ., 460
Fed.Appx. 23, 25 (2d Cir. 2012), citing Gorman-Bakos v. Cornell
Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001), and Espinal v.
Goord, 558 F.3d 119, 129 (2d Cir. 2009).  However, the cases
which accept temporal proximity "as sufficient evidence of
causality to establish a prima facie case uniformly hold that the
temporal proximity must be very close." Harrison v. United
States Postal Serv., supra, 450 F. App'x at 40-41, quoting Clark
County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).

34

While the Second Circuit has held that "six weeks [between the employer's awareness of protected conduct and the adverse action] fits comfortably within any line [the Court might draw," Nagle v. Marron, 663 F.3d 100, 110-11 (2d Cir. 2011), "even a four-month interval . . . is insufficient in itself to establish the causal connection necessary to support a retaliation claim," Perry v. NYSARC, Inc., 424 F. App'x 23, 26 (2d Cir. 2011), citing Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990), and "action taken twenty months after the protected activity 'suggests, by itself, no causality at all.'"  Perry v. NYSARC, Inc., supra, 424 F. App'x at 26, quoting Clark County School Dist. v. Breeden, supra, 532 U.S. at 273 see also Murray v. Visiting Nurse Services of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (Sullivan, D.J.)("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation."); Garrett v. Garden City Hotel, Inc., 05-CV-0962 (JFB)(AKT), 2007 WL 1174891 at *21 (E.D.N.Y. Apr. 19, 2007) (finding interval of two and one-half months between most recent complaint of racial discrimination and discharge "in the absence of other evidence of defendant's retaliatory motive, precludes a

finding of a causal connection between the protected activity and the adverse employment action").

As discussed above, because plaintiff proffers no evidence of direct retaliatory animus, she must rely on temporal proximity to support an indirect inference of causation.  The last time plaintiff engaged in the protected activity of filing complaints of discrimination before her allegedly retaliatory transfer appears to have been February 2007 (see Exhibit S to Collyer Decl., at 1).  Defendants contend that plaintiff's transfer occurred in early August 2007, more than six months after the alleged protected activity, but the evidence they cite suggests only that the transfer occurred at some point between when plaintiff was placed on restricted duty in April and her September retirement (see Defs.' Mem. at 5 n.4).  Plaintiff, on the contrary, alleges that her transfer occurred when she attempted to return to work on April 4, 2007 (Typed Statement at 21).  While a six month gap is certainly too temporally attenuated to support an inference of causation, a gap of potentially fewer than two months, if the facts are construed in plaintiff's favor, could potentially support such an inference.  Thus, I cannot say that plaintiff is unable to demonstrate causation as a matter of law.

However, even assuming that plaintiff has established a prima facie case of retaliation with respect to her transfer, her retaliation claims brought under Title VII and NYSHRL must, nevertheless, be dismissed.  As noted above, defendants offer evidence that plaintiff was transferred "because another officer had been performing the duties of her previous position for the duration of her absence," which lasted for over six months (Defs.' Mem. at 21).  Plaintiff has not offered any evidence that this reason was pretextual.  Moreover, mere temporal proximity is insufficient to show pretext at the third step.  El Sayed v. Hilton Hotels Corp., supra, 627 F.3d at 933.  Thus, just as the absence of evidence of pretext warrants dismissal of plaintiff's discrimination claim, it also warrants dismissal of her retaliation claim.

3.   Plaintiff's Hostile
Work Environment and
Constructive Discharge Claims

Plaintiff also asserts claims for a hostile work environment and constructive discharge.

The requirements of a hostile environment claim were reviewed by the Court of Appeals for the Second Circuit in Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685 (2d Cir. 2012):

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Gorzynski, 596 F.3d at 102 (quoting Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)).  In considering whether a plaintiff has met this burden, courts should "examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance."  Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003) (quotation marks omitted).  Moreover, the "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir.2002) (quotation marks omitted).  Of course, "[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic," such as race or national origin. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added).

(brackets in original).  See also Pa. State Police v. Suders, 542

U.S. 129, 133-34 (2004); Clark Cnty. Sch. Dist. v. Breeden, 532

U.S. 268, 270-71 (2001) (per curiam); Patane v. Clark, 508 F.3d

106, 113 (2d Cir. 2007); Demoret v. Zegarelli, 451 F.3d 140, 149

(2d Cir. 2006); Schiano v. Quality Payroll Sys., Inc., 445 F.3d

597, 605 (2d Cir. 2006); Petrosino v. Bell Atl., 385 F.3d 210,

221-22 (2d Cir. 2004); Feingold v. New York, 366 F.3d 138, 149-50

(2d Cir. 2004); <u>Hayut v. State Univ. of N.Y.</u>, 352 F.3d 733, 744-45 (2d Cir. 2003); <u>Alfano v. Costello</u>, 294 F.3d 365, 373-74 (2d Cir. 2002); <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 69 (2d Cir. 2000).

A hostile environment claim requires evidence that the offensive conduct is severe and pervasive; the offensive conduct need not, however, be intolerable or unendurable.

> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment <u>altered</u> <u>for</u> <u>the</u> <u>worse</u>.'" (alteration and emphasis in the original).
>
> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 148 (2d Cir. 2003) (quoting <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 70 (2d Cir. 2000)). "The environment need not be 'unendurable' or 'intolerable.'" <u>Id</u>. In brief, "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." <u>Id</u>. (quoting <u>Whidbee</u>, 223 F.3d at 70 (internal quotation marks omitted)).

<u>Feingold v. New York</u>, <u>supra</u>, 366 F.3d at 150.

In determining whether the level of workplace misconduct constitutes an actionable "hostile environment," no single factor is determinative; rather, the court must consider the totality of the circumstances. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998); <u>Raniola v. Bratton</u>, <u>supra</u>, 29

39

243 F.3d at 617; Cruz v. Coach Stores, Inc., supra, 202 F.3d at
570.  See also Hayut v. State Univ. of N.Y., supra, 352 F.3d at
746 (hostile environment claims are "fact-specific and
circumstance-driven"). "Factors that a court might consider in
assessing the totality of the circumstances include: (1) the
frequency of the discriminatory conduct; (2) its severity; (3)
whether it is threatening and humiliating, or a mere offensive
utterance; and (4) 'whether it unreasonably interferes with the
performance of an employee's work performance.'"  Patane v.
Clark, supra, 508 F.3d at 113, quoting Harris v. Forklift Sys.,
Inc., 510 U.S. 17, 23 (1993).

        A constructive discharge is the most aggravated form
of a hostile environment.  Ferraro v. Kellwood Co., 03 Civ. 8492
(SAS), 2004 WL 2646619 at *11 (S.D.N.Y. Nov. 18, 2004)
(Scheindlin, D.J.), aff'd, 440 F.3d 96 (2d Cir. 2006) (explaining
that "[c]onstructive discharge is regarded as an aggravated case
of hostile work environment"); see Pa. State Police v. Suders,
542 U.S. 129, 149 (2004); Lugo v. Shinseki, 06 Civ. 13187
(LAK)(GWG), 2010 WL 1993065 at *11 (S.D.N.Y. May 19, 2010)
(Gorenstein, M.J.) (Report & Recommendation); Divers v. Metro.
Jewish Health Sys., 06-CV-6704 (RMM)(JMA), 2009 WL 103703, at *19
(E.D.N.Y. Jan. 14, 2009).

Having thoroughly reviewed plaintiff's Amended Complaint, her Opposition to defendants' motion to dismiss, and her deposition testimony, I find that no reasonable juror could conclude that she was subjected to a hostile work environment, much less constructively discharged.  Plaintiff's allegations are comprised largely of conclusory statements, immaterial accusations and misperceptions of ostensibly innocuous conduct. Plaintiff states that "[t]he police department intentionally created a hostile work environment by creating a work environment where gay women imposed on me in a sexual manner and ultimately ruined my marriage" (Typed Statement at 21).  However, plaintiff cites the following examples as support for this contention:

- For some reason, everywhere I went someone gay was interested in me and I had no problem letting them know that that lifestyle is not for me.  I felt as though they were imposing on my sexuality.  I am only heterosexual (Typed Statement at 14)

- [A] PAA from the academy told me that she was a gay female and I began to see a manly looking woman visit her.  This woman was a female by gender only.  She looked like a man and I began to get disgusted in the presence of Lt. Diggs-Andrews.  She often visited my cubicle and I began to realize that I had no business in this environment (Typed Statement at 15)

- Somewhere around this time, I had Detective McLouglin run up to me and kiss me on the cheek and tell me that he knows Lt. Diggs-Andrews from my previous command.  I was pissed, shocked and told him never to do that again (Pl's Dep. at 20).

41

- DC Ziegler also began to inquire about my hair extensions as well?  She was a 'groupie.'  While assigned to the academy PO Grimes seemed extremely interested in my hair as opposed to her work and it was the case with all these Black females.  It was a shame to work in this environment (Pl's Dep. at 18)

- I was transferred to PBBS and had a known bisexual white female Sergeant Margaret Ross touch my hand in a sexual manner, sort of in a caressing way?!  I was both upset and confused again.  It seemed as if everywhere I went, I was being sexually harassed (Pl's Dep. at 18)

- Within the police department, they have certain organizations.  They have GOAL, which is the Gay Officers Action League.  These officers communicate with one another with psychosis, and these gay females were making comments on my rear end as I walked up the stairs, she has a nice ass (Pl's Dep. at 103-04).

- Sue Murray would undress me with her eyes by the way she looked at me.  I was looked at as though I was a piece of meat.  I was stressed.  I broke down in tears several times (Pl's Dep. at 105).

Although there is no "bright line" test to determine whether there is sufficient evidence to support a finding that the objective element of a hostile-environment claim has been satisfied, a brief review of some of the cases in which hostile environments were found to be sufficiently alleged is helpful to illuminate the general principals set forth above.

In Petrosino v. Bell Atlantic, supra, 385 F.3d at 215, the Court of Appeals found that a jury could conclude that the objective element of a hostile environment claim was satisfied

where plaintiff, a female telephone installation and repair technician, was subjected to an ongoing barrage of crude graffiti in the work place depicting sex acts, frequent disparaging remarks concerning her "'ass,' her 'tits,' [and] her menstrual cycle," was referred to as "'a damn woman,'" and was told to calm her "'big tits down.'"

In Fitzgerald v. Henderson, 251 F.3d 345, 350 (2d Cir. 2001), a grant of summary judgment for the defendant in a hostile environment case was reversed where plaintiff alleged that the offending party regularly entered her cubicle, stood close to her, touched her shoulder, commented on her body and her appearance in shorts, asked about plaintiff's marriage, and complained that his own wife was "'no fun.'"  The offending party also ran his fingers through plaintiff's hair, invited her out socially, and on one occasion, unbuttoned his shirt in front of plaintiff and stated that he would father plaintiff's first child.  The offending conduct allegedly lasted from August, 1994 through Spring, 1995.  251 F.3d at 349-50.  See also Holtz v. Rockefeller & Co., supra, 258 F.3d at 70, 75-76 (evidence sufficient to support a finding of gender-based hostile environment where harasser touched plaintiff in unwelcome manner on a "daily" basis, made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or

43

twenty" comments concerning plaintiff's sex life).  See generally Alfano v. Costello, supra, 294 F.3d at 379-80 (summarizing the facts of numerous successful and unsuccessful hostile environment cases).

In light of the foregoing authorities, I conclude that the conduct alleged here is insufficient to constitute a hostile environment based on either plaintiff's race or gender.

Plaintiff's allegations, "even when examined collectively, simply 'do not paint the portrait of a hostile workplace environment that rises to the legal standard articulated.'"  See Perez v. Communications Workers of America Local 1109, 2005 WL 2149204 at *10 (E.D.N.Y. 2005), aff'd, 210 Fed.Appx. 27 (2d Cir. 2006) (quoting Ellenbogen v. Projection Video Servs., Inc., No. 99 Civ. 11046 (NRB), 2001 WL 736774 at *10 (S.D.N.Y. June 29, 2001)).  Although I do not doubt that the incidents plaintiff cites were a source of angst or extreme discomfort to her, perhaps due a personal aversion to homosexuality, no reasonable juror could conclude that incidents such as these amounted objectively hostile or abusive conduct by plaintiff's co-workers, the NYPD or the City of New York.  Thus, plaintiff has failed to raise a triable issue of fact as to whether she was subjected to a hostile work environment by "gay

44

women" who "imposed on [her] in a sexual manner" (Typed Statement at 21).

Regarding plaintiff's other, more serious allegations, e.g., that she was "raped and set up to have several fictitious friendships and relationships," (Pl's Aff. at 1-2) as explained above, plaintiff has not offered evidence to support these allegations during the course of this litigation.  Defendants, on the contrary, have produced unrebutted evidence that strongly suggests that many, if not all, of plaintiff's allegations are, unfortunately, the product of her diagnosed mental illnesses. The report of Dr. Alice Steiner, a psychologist, dated November 16, 2007, makes the following observations regarding plaintiff's mental status:

> [Plaintiff] has suffered from depression and paranoia from at least as far back as early 4/07 and her condition has only worsened.  It is likely that although she denied hearing voices, she actually was experiencing auditory hallucinations for some time. Her thoughts were disorganized, confused, and she exhibited psychomotor retardation.  Paranoid thinking was constant, particularly with regard to a coworker having an affair with her husband, and [plaintiff] herself had doubts as to her reality testing.  It was extremely difficult for her to deal with stress, and her judgments about how to do so were problematic and only caused her more difficulties.  Her behavior has been highly erratic.  She felt that she was harassed on the job for a number of reasons, but this may well be due to her paranoia.  She is not suitable for full duty should she wish to return to the Dept., and there is no indication that her present condition is the result of any job situation.  Since [plaintiff] has been

45

>            resistant to treatment and refused to take medication
>            for her depression, it is unclear whether her psychotic
>            symptoms were the result of her depression or whether
>            trying to cope with her psychosis as well as with her
>            other stres[s]ors was depressing for her.  The latter
>            appears to the undersigned to be the case.

(Nov. 6 Eval. at 4)(emphasis added).  Dr. Steiner diagnosed

plaintiff with "Schizophrenia, Paranoid Type," and "Depressive

Disorder, Not Otherwise Specified" (Nov. 6 Eval. at 4).

        The inherent implausibility of many of plaintiff's

allegations do indeed suggest that she suffered, and continues to

suffer, from delusions, including, <u>inter alia</u>, that the NYPD

"tapped into [her] cable box and had a picture of 2 Black females

having sex" displayed in her television, staged several car

accidents involving her daughter, "subjected [plaintiff] to pick

pockets while on the NYC train station," and "has the ability to

make residents psychotic" (Pl's Aff. at 1-3).  Plaintiff admits

to hearing voices during the relevant time period (<u>see</u>, <u>e</u>.<u>g</u>.,

EEOC Charge at 1-2), and also makes several references to

"psychosis," in her submissions and deposition, by which she

apparently means, as best as I can discern, some form of mind

control or telepathy (<u>see</u>, <u>e</u>.<u>g</u>., Pl's Dep. at 16 ("Whoever

created the hip-hop clothing line had psychosis with me.")).

Sadly, these statements leave little doubt that plaintiff's

mental illnesses are at the root of her allegations of sexual assault.

According to 28 U.S.C. § 1915(e)(2)(B)(i), a court may "dismiss the action of a litigant proceeding in forma pauperis at any time if the court determines that the action is 'frivolous or malicious.'" McCormick v. Jackson, 07 Civ. 7893 (JSR), 2008 WL 3891260 at *1 (S.D.N.Y. Aug. 21, 2008) (Rakoff, D.J.).  "A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless' -- that is, if they are 'fanciful,' 'fantastic' or 'delusional.'" Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011), quoting Denton v. Hernandez, 504 U.S. 25, 32-33 (1992).  As discussed above, many of plaintiff's allegations with respect to her hostile work environment and constructive discharge claims are accurately characterized as legally insufficient or delusional.  Thus, the summary judgment should be granted dismissing these claims.[10]

---

[10] Given the fact that plaintiff's Title VII claims are substantively deficient, it is unnecessary to address defendants' arguments that they are time-barred.

IV.   <u>Conclusion</u>

Accordingly, for all the foregoing reasons, I respectfully recommend that defendants' motion for summary judgment be granted in its entirety.

V.   <u>Objections</u>

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  <u>See</u> <u>also</u> Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Andrew L. Carter, United States District Judge, 500 Pearl Street, Room 725, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Carter.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension</u>

Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v.
Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair
Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714
F.2d 234, 237-238 (2d Cir. 1983).

Dated:  New York, New York
        February 6, 2013

                                Respectfully submitted,


                                _____
                                HENRY PITMAN
                                United States Magistrate Judge

Copies mailed to:

Ms. Tara M. Wilson
95 Kingston Avenue
South Floral Park, New York 11001

Courtney B. Stein, Esq.
Assistant Corporation Counsel
City of New York
100 Church Street
New York, New York 10007